May it please the Court, I am representing Whitewater Draw Natural Resources, et al. The first problem with the order is Count 1, which states that the instruction manual is not final in binding and thus not a final action under Hays' Law, Banner v. Spear. This is an untenable argument, which even DHS is not able to maintain between its motion for summary judgment and its motion to dismiss. It simply misrepresents the document, what the manual is, and it creates distinctions in case law if you're misstating the case law. For instance, it claims it's not final by comparing case law, which finds frameworks like to be, frameworks for future action, to be final under Bennett. It also claims that it's not final by comparing it to actions within draft environmental impact statements, which are drafts by their nature. Secondly, DHS errs in stating that the manual is not binding on DHS. It compares this document to documents that are meant to bind. You're saying that that would be binding in the same way that procedural rules would be binding. What makes this substantive in any way? What makes this a rule that's reviewable? Well... Just a framework for a decision. It's not a framework for a decision. It creates binding legal consequences on DHS. For instance, it creates categorical exclusions, which are recognized to be final actions. If you have a categorical decision, why don't you just challenge the decision instead of challenging the rule under which the decision was made? Those are two very different things. Well, the reason why we can't do that here is because the manual itself doesn't touch the issue that it needs to touch. The manual itself is arbitrary and capricious because it creates a framework that doesn't include immigration at all, even though immigration is significantly environmentally impactful. But counsel, if you were to proceed on, let's say, your STEM rule and say, well, the STEM rule requires the preparation of an EIS, and to win on that, it might require changes in the manual going forward if we were to uphold your position. But that would be a challenge then to the STEM rule, and it might have consequences back up the line. But I don't see how you get to challenge the manual. The manual gives USCIS and ICE cover for the categorical exemptions, even though there's no basis for them. It never did any scoping. It never touched the issue. It's very easy for the DHS to just pass law after law, which, in fact, it did as we challenged in count three. We do, in fact, challenge that, but the manual itself sets out a binding framework. It's sometimes substantive in that it allows DHS to fail to do anything on certain areas, and it allows DHS to make arbitrary and capricious statements, such as count four is not binding. It's fine, and yet you never can really access a categorical exclusion. And furthermore, precedent doesn't say that only substantive rules are final actions. For instance, under State for Chemicals, both procedures and the actions implemented to those procedures are final actions. So it's another kind of regulation. Now, every agency is under the Council for Environmental Equality and Congress obligated to pass NEPA procedures, and DHS doesn't have the unilateral ability to get rid of these procedures. It has to go through DHS and through the Council for Environmental Equality and get approval. It put them through notice and comment, just like regulation. Furthermore, many of the agencies did enter these documents in the Code of Federal Regulations. So you could say any regulation that sets out the procedure— Counsel, you've argued that the manual creates binding legal consequences. Does it create binding legal consequences for you? It creates binding legal consequences on DHS itself. No, that's not the question I asked you. Does it create any binding legal consequences for you and your clients? It doesn't create binding legal consequences. Then why are we here arguing about this manual? Because the case law is clear that final actions can also merely bind the agency itself. It does not have to bind third parties. And in fact, in NEPA cases, it never binds third parties. There is not a single NEPA case that binds third parties. So if we said that only an EIS that bounds third parties could be challenged, we would never be able to bring challenges under NEPA ever because none of them would bind. The problem you have is the type of action you're challenging. This is a manual. Provides basically some kind of overarching procedural framework for decision-making. There's no actual binding output from this that affects your clients in any way. It does affect my clients because there's no NEPA analysis. And that affects my clients procedurally. I mean, again, in NEPA, environmental documents do not establish duties or requirements on the public. They are for the public. You have a number of different claims and some of the issues differ. So I think we have your argument on this point. Maybe you want to address some of the other claims. Yes. So second, DHS misconstrues count two by describing this challenge as a challenge to the programs themselves rather than a strictly procedural claim under NEPA for violations. So repeatedly, DHS imputes a substantive challenge to these programs. It cites Lujan and Norton. However, plaintiffs have not made any kind of substantive challenge to these programs. They have only made a challenge that all these programs were adopted and later modified multiple times without any sort of NEPA analysis. So we point to seven discrete programs and we name each specific action where the program was adopted initially and then where the programs were modified since. So one example is DACA. That was created by a specific order. It was explicitly designed to keep aliens in the country rather than letting them leave a certain class, and it eventually expanded to 800,000 people. Now, it adopted DACA without any NEPA analysis, no citation to a pedigree exclusion, no environmental assessment. However, the addition of 800,000 people is an environmentally significant impact. I mean, that is a lot of people who might have left the country and stayed. Also, we would say that DACA encouraged more people to come under the idea that there would be an amnesty for them as well. So again, this program was adopted without NEPA analysis. We don't challenge the program for being unlawful. We challenge it for not doing NEPA analysis. So another example is the Student and Exchange Visitor Program, which, according to DHS website, has about a million people currently, which is the size of a large city. So the idea that the presence of all of these people has no environmental impact is arbitrary and capricious, especially when you consider that NEPA itself was designed primarily to think about issues like population growth. It was established. It never went through NEPA. It never considered the consequences of population growth. And it continues to modify it with a series of discrete actions, some of which we show. For instance, it created an OPT program so that students could stay longer in the country. And it continued to expand the time students could stay in the country. And it continued to make the program larger and more attractive. And every time it admitted, the point was to make the program more attractive for more people to join it. And these have cumulative impacts. One small action may not significantly change the program. But if you add them all up, it increases the population of the United States. Right. This suit seems to me to have just a number of central deficiencies to it, stemming largely from the ambition of what's being attempted here. I mean, I just have a real difficulty understanding how you can, for the discrete actions, how your clients are understanding. How can you meet the causation and redressability requirements of Article 3? It's all in the cumulative impacts of these actions. These actions grow the population. And cumulatively, they grow the population a great deal. And these plaintiffs have all established that they have been particularly impacted by the population growth driven by immigration in their areas. For instance, Stuart Herbert, he has been studying a lake which continues to shrink because of the water withdrawals that are only made necessary by the population growth. You know, they live in areas where their quality of life continues to change because of population growth driven by immigration. California's population would not be increasing without immigration for a long time now. So, these are specific and they've never done NEPA. And again, just like any NEPA case, if you can't show, if you show you're affected by the lack of analysis, the redressability requirements are relaxed. So, in NEPA, the redressability has to show that your procedural violation might have changed your situation. That is definitely true of these plaintiffs. Furthermore, we have plaintiffs who live right on the border and they have been very directly affected by the environmental crisis caused by DHS's actions, which is that people cross the border, their own property is continually crossed. They have to pick up trash. Which of these programs allows people to cross the border illegally on your client's property? The programs don't allow it, but they do encourage and incentivize it. And that is a foreseeable consequence. We have pled. And so, you can challenge DACA, which applies to people who are already in the United States, because if we allow these people to come in the United States, other people might be encouraged to come from other countries and they leave stuff on your client's property? That's pretty attenuated. It's not attenuated at all. People who cross directly say they cross because of promises made by the government. And what are the promises that the government has made? I mean, the government does not... The point of NEPA is not that the government can't disclaim any responsibility for the actions that it does. The point of NEPA is that the government has to think about its actions and if it's... Counsel, I'm asking you to give me an example of a program that encourages people to come. I understand that people have misperceptions about government policy, such as DACA. I wouldn't say that it's a misperception. But I don't know that you have to run a NEPA because people might misunderstand. I mean, CAM is another program. If you come, you will be given asylum. You will be given a claim. You will be given a notice to appear. I mean, it's, you know, you can also... I mean, it's also NEPA requires that you look at foreseeable impacts. Now, it is foreseeable that aliens will look at what's happened in the past and assume the government will continue to mirror its own behavior. Now, our plaintiffs have seen that this is, in fact, true. They say... Okay, counsel, with respect to, let's say, asylum and CAT protections, those are mandated both by international treaties, international law, and by instructions from Congress. So, in implementing them, does the executive have to do a NEPA evaluation when Congress has given them clear instructions? If Congress has given them instructions that give them absolutely no discretion, yes. But in this case, that is not the case. NEPA applies when there is discretion. Okay, tell me how... I have to say, I'm really confused. You are arguing at such a high level of abstraction. I'm having a very difficult time following it. So, give me an example. For instance, when DHS revoked Remain in Mexico, that changed the asylum. That caused an immediate rush on the border. So, it's certainly... But we still have to make the evaluations on a case-by-case basis as to whether these people are entitled to asylum. The question is whether they can remain on which side of the border is a very temporary kind of decision. But we have international obligations and a statutory obligation to entertain CAT asylum withholding claims. It's not at all a very, very minor consideration. Many illegal aliens have been shown to come because they get in. And once they get in, they can blend into the population. So, this just isn't a minor question. Furthermore, DHS under NEPA has the obligation to ask. It may not have... Under NEPA, it can decide that's not enough. It can decide we're going to have the policy the way we want it, regardless of what might happen. But it has the obligation to ask. And we're talking about something that clearly changes that. It's very recently we saw a change in policy and immediately a change in how many people cross the border. That kind of correlation is enough for NEPA. It may not be enough to challenge the decisions on their substance, but it is enough to challenge DHS for failing to consider it. Counsel, you have the opportunity to reserve time for rebuttal. I'll reserve my time for rebuttal. Okay. Thank you very much. We'll go ahead and now hear from the government. Good morning. May it please the court. Kevin McCardle on behalf of the Department of Homeland Security. District Court correctly held that plaintiff's claims are not subject to the federal court's limited jurisdiction under the Administrative Procedure Act in Article 3. The DHS NEPA manual challenging Count 1 is not a final agency action under... Revealable under the APA. The challenge in Count 2 to what plaintiffs describe as seven ongoing active immigration programs doesn't challenge any discrete agency action as that term of art is defined in the APA. And although the remainder of the amended complaint does target discrete actions, the plaintiffs haven't shown that they have Article 3 or APA standing to challenge those specific actions. With the court's permission, I'll take each one of those issues in turn. So on the manual, as the court noted in the preceding dialogue with Ms. Axelrod, the manual is a set of internal operating procedures. It doesn't impose any substantive rules, which is required under the eclectus parrot test to be binding on the agency. It has no effect whatsoever on the plaintiffs or on any other third parties outside of the government. As the district court noted, it doesn't even discuss any legal requirements other than those prescribed by NEPA and CEQ regulations. So as Judge Bybee noted, to the extent plaintiffs want to challenge the procedural framework established by the manual, the way to do so would be to bring that argument in the context of the challenge to a particular discrete final decision made under the manual that adversely affects the plaintiffs. But in the absence of any application that adversely affects the plaintiffs, it's not an agency action subject to review under the APA. It's a final agency action. As to the program, oh, I'm sorry. One more point on the categorical exclusions. The count one of the complaint doesn't challenge any particular categorical exclusion. The plaintiffs challenged one in count three, and we separately addressed that. But count one addresses the body of the manual itself. And the plaintiffs now want to argue that they're actually challenging an unidentified categorical exclusion. They've got another problem, and that's the problem that they admitted in their own opening brief discussed, I think, at pages 41 and 42 under Summers. You can't just challenge a categorical exclusion in the abstract apart from any particular application. So if that's now their claim, it would suffer from a different justiciability defense. On the programmatic challenge point, count two, the first component, and I should clarify, we're not saying that the DACA policy, their challenge to that specific policy memorandum is a programmatic challenge. We're arguing that they lack standing to challenge that particular discrete issuance of the memorandum. But the remainder of count two challenges what plaintiffs categorize or describe as ongoing active programs. And so, for example, one of these programs, the plaintiffs label family-based immigration, which is not any kind of authoritative term that's specified in any particular statutory provision. It's simply the name that the plaintiffs have decided to give to what they characterize as nine ongoing visa programs relating to family members. So this is described by the plaintiffs at ER 194. So, for example, these nine categories include visas for spouses and children of U.S. citizens trying to come into the country and visas for orphans to be adopted by U.S. citizens, as well as visas for other family members. And what the plaintiffs want the court to do is to step in and to pause those nine active visa programs, as well as the 20 or so active visa programs under what they label as non-immigrant programs, as well as the five or six other programs. And that is no different from the programmatic claim that the plaintiffs brought in National Wildlife Federation. And it's non-justiciable for the same reasons. The plaintiffs here today attempted to draw a distinction between the programs and NEPA. And they said they're not challenging the programs. They're simply challenging NEPA. But that makes no sense because the claim, just as in National Wildlife Federation, which was a NEPA case, the claim has to be that you are carrying out these programs in violation of NEPA. There's no NEPA obligation in the abstract, apart from any particular action that supposedly triggers the procedural requirements of the statute. So by definition, they are challenging what they describe as these programs, and you can't do that. You have to challenge a discrete agency action, as that term is defined in the APA. And the Supreme Court did give two ways whereby a plaintiff can ultimately obtain programmatic relief. The first is if the plaintiff challenges a discrete agency action adopting a program. And the plaintiffs themselves have provided an example of that in their reply brief, the California Wilderness case. At issue there was a discrete Department of Energy order that established two regional electric transmission corridors under which future activities would occur. And there was no dispute that that order was a discrete action that established a program. And if the plaintiffs could identify something along those lines, they could challenge that. The Supreme Court also said in National Wildlife Federation that if you can, if there's a board to all activities within a program, you can challenge that action. But of course, we don't have that here. We just have plaintiffs label these ongoing visa administration, administration of ongoing visa activities as a program, and then cite a few regulations that have been issued since 1980 in furtherance of these programs. And that's not how judicial review can proceed under the APA, as the district court correctly ruled. On the standing issue, I think we've outlined in our brief on an action by action basis what the defects in the plaintiff's standing theories are. And I'm happy to answer any questions about those particular actions. The DACA program in particular came up in the initial presentation. But I think ultimately, I'd like to focus on the overarching defects in plaintiff's theory, which also highlights the fundamental problem in their case. The plaintiffs have submitted a lot of declarations, but none of them are tied to the specific agency actions at issue in the remainder of the complaint. The plaintiffs allege broad harms from decades of population growth and from illegal border crossings since the 1970s, but they make no effort whatsoever to tie any specific harm to any specific individual from any of the specific actions at issue. And in the absence of that kind of showing, particularly at summary judgment, the plaintiffs lack standing. And I think two cases I would point the court's attention to, which I think are the most helpful are Summers v. Earth Island Institute from the Supreme Court, and also Washington Environmental Council v. Bella. And in Summers, the court took pains to review the Benzmann affidavit in that case, which it was a challenge to a Forest Service regulation that exempted certain projects from notice and comment requirements and from protest requirements. So it was just like this case in that it was a procedural challenge. The court emphasized the fact that it's a procedural challenge doesn't eliminate the hard floor of Article III, which is that the plaintiff show a concrete and personal injury to him or her, that he or she is among the injured. And then it scrutinized the declaration and found that it was insufficient because the declaration simply alleged harm from Forest Service development without tying that harm to a specific portion of the forest and to a specific project under the challenge regulations, which threatened harm to the plaintiff's interests in that area. So is your position here that the plaintiffs haven't alleged injury in fact? Is your position that the problems here really go to the second and third columns of the standing analysis? That's an excellent question, Your Honor. And I think if you look at the case law, the line between injury in fact and causation in particular sometimes gets blurred. Like, for instance, in the Ninth Circuit and NEPA cases, the plaintiffs required to show and not merely allege at summary judgment, as they say incorrectly in their reply brief, they have to show with competent evidence, specific facts, that the challenged action threatens their concrete interests in a particular area. So there is a link between injury in fact and causation that's sometimes hard to separate. Ultimately, though, if we can say that they've adequately alleged injury from population growth generally. So if that's sufficient to establish an injury in fact, they would satisfy that requirement. But I think Summers, again, shows that it's not just an injury in the abstract. It's an injury tied to the specific action, and perhaps that overlaps with the causation element, Your Honor. And even if it's characterized exclusively as a causation problem, they haven't established causation or redressability. I mean, the STEM rule is another specific example that's worth highlighting. The plaintiffs in their initial presentation talked about the student and exchange visitor program. Well, the challenged action, the STEM rule, only made one minor change to that program. It didn't establish the program. It simply made a minor change. It said that international students with STEM degrees who are engaged in optional practical training can seek a 24-month extension of that training as opposed to a 17-month extension under the prior rule. So that's a modest change. It's not an establishment of a whole new program. It doesn't authorize anyone to come into the country. And even if it was designed to make the program more attractive, at summary judgment, the plaintiffs have a burden to show that it in fact causes an increase in the population that threatens their concrete interests. And they haven't done that with respect to any of the remaining agency actions challenged in the amenity complaint. Counsel, I've got a couple of questions that are sort of general procedural questions, so bear with me just a bit. And let's take the STEM rule as an example. Is there any authorization in the INA or any other law that DHS would be following that allows for special judicial review? Is there a judicial review provision in the INA or any place else? Your Honor, I'm not aware of any special judicial review provision that would govern the issuance of the rule itself. OK. All right. And that was my understanding, which means, then, that the APA applies and there is a six-year statute of limitations. Is that correct on challenges? Yes, Your Honor. That's your understanding as well. OK. Now, with respect to the STEM rule, when that rule was issued, let's suppose that there was a challenge by somebody to the rule, somebody who had an interest in the STEM, a university or somebody like that. Could these plaintiffs have also filed a petition for review of the STEM rule at that time? That's an excellent question. I'm sorry. The STEM rule, if they timely filed, the STEM rule was issued within the six-year statute of limitations. Sure. No, I understand. I understand that this suit was filed within six years of the adoption of the STEM rule. But let's suppose that within some very, very short period after the STEM rule was adopted, let's say 60 days, that somebody who clearly had an interest in that rule, let's say a university, challenged the rule because they thought it ought to go to 36 months and it was arbitrary and capricious. Could these plaintiffs have also filed a petition at the same time to review that rule for whatever purposes they wished? They could challenge the... I'm sorry if I'm having trouble following the question, Your Honor. It's my fault. They could certainly, I think, challenge the rule. If the question is whether they could get at the underlying program as a whole or the prior regulations that established the program, if that's the court's question, that would depend on application at a minimum of the so-called reopening doctrine, whether this minor change to the rule reopened the entirety of the program, which admittedly by the plaintiffs was established 30 years ago. And it's hard to address in the abstract, but this type of a minor change doesn't seem to trigger reopening, particularly since that doctrine requires the agency to indicate that it's undertaking a full review of the rule as a whole. I'm not sure if that answers your question. Yeah, I think that's helpful. I had some concerns about ripeness here, and not really ripeness so much as over-ripeness. That is that there seem to be some really late challenges to rules that have been around for quite some time. Well, that's absolutely true with respect to at least 60 of the rules that are catalogued in an attachment to the complaint. Most of those are well outside of the statute of limitations, and any NEPA challenge to those would be barred by the six-year limitations period in 2401A. And unless the plaintiffs, and it would be their burden, could establish that some of these minor, more recent changes constituted a full-fledged reopening, they couldn't get at the underlying rules themselves. But of course, at a minimum, they'd first have to show that they had standing to challenge the specific amendment. And that's why I asked about the special review statute. Because when we do have laws that do have special review statutes, they usually provide for some period of time, let's say 60 days, in which to file a petition after you have a final rule. And what I'm curious is whether, if there were a special review statute, whether these plaintiffs would have standing to bring a challenge to the rule within that 60 days if there were a special review statute. Trying to figure out whether there's any difference here in the way that we approach standing, because there is no special review statute. Well, I think now I'm going to have to go back to that. I told you I was a little far afield here, so I'm going to ask if you're bearing with me. I'm very familiar with those 60-day review provisions for petitions for review in other contexts. And I need to verify that, in fact, there are none. And I don't think there are simply any. I didn't find any. And the district court commented there was not a special review statute. This is hypothetical. I'm trying to figure out whether these, if they had, let's suppose they commented on the rules. Could these petitioners, would these petitioners have then had standing to bring a challenge to the rule within, let's say, a 60-day period? If there were a special review statute. They might have statutory standing, but they would not, on that basis alone, have Article 3 standing. Because as the Supreme Court said in Summers, Article 3, the injury in fact requirement, is a hard floor that can't be removed by statute. So simply because Congress has created a procedural right to bring suit within, to file a petition for review, that in and of itself wouldn't establish Article 3 standing, even if they could get around. Although we're typically pretty generous on review when you have a special review statute, especially if you have people who are complaining and participated by commenting on the rule. That's true. I guess it's hard for me to address in the abstract without seeing the specifics of both the statute and the facts. I don't think I'd want to concede that merely submitting comments would give you standing because there's a special petition for review statute. That seems problematic under Summers. But I'd need to look at the particulars. I'm sorry, I can't be more specific. Thank you. Okay, I'm happy to answer any other questions. But otherwise, for the reasons stated here in our brief, the district court's decision is correct and should be affirmed. Okay, thank you, counsel. Let me ask my colleagues if they have any more questions for the government. Okay, Ms. Axelrod, we'll now hear from you in rebuttal. Thank you. First, I'd like to address DHS's misstatements about Norton v. Utah Alliance. Utah Alliance made three claims that the Bureau of Land Management failed to violate an obligation to protect public land and failed to implement provisions in the land use plan, and finally asked them to do a supplemental analysis. The court ruled that the first two were substantive, and the plaintiffs couldn't say anything about it, and that the supplemental claim couldn't be addressed because there was no ongoing action. So it doesn't say that you can't bring any action of the type we brought. Second, Lujan says redressability is relaxed in NEPA cases, and standing is relaxed. By DHS's definition, there really wouldn't be any NEPA claims whatsoever, because all an agency would have to do is not do analysis and then say, well, you can't prove the environmental impacts that we never analyzed, so they don't exist. It never did analysis. No, that seems like a misstatement. I mean, there are NEPA cases where they're standing. I think the difficulty here is the nature of the allegations and the scope of the complaint, really. I mean, yes, Your Honor, and this is similar to cases where NEPA has found standing, because they have addressed the specific impacts of population growth, which is the primary stated concern of the statute itself. And all of the standing analysis and all of the statements that these programs shouldn't have been challenged neglect the fact that NEPA is about cumulative impacts. That's from case law, not from regulation. And there are cumulative impacts of all of these cases. I mean, the student visa regulation that DHS just pointed out is a great example. They said, look, this is a minor, you know, this is a minor change. Well, if you make 20 minor changes, you might end up with a major change. And because the instruction manual sets out no framework, it allows them cover to do that, which, again, is why the instruction manual is important. I mean, another problem is that DHS claims that we made up the definition of program. We just arbitrarily called a bunch of things a program. That's actually not true. It's from 4 ACFR 1508. A NEPA triggering action includes the adoption of a program, such as a group of concerted actions to implement a specific policy or plan, systematic and connected agency decisions, allocating agency resources to implement a specific statutory program or executive directive. So, what we have are executive directives in DACA, and we have statutory authority in the INA, several different ones, classes, work visas, family visas, nonimmigrant visas, and connected actions that implement the program. So, it's not, it's just not our decision. Thank you, counsel. We appreciate the argument from both sides and the briefing from both sides. This case is submitted. That concludes our calendar for this morning and the recess until tomorrow morning. Thank you all. This clerk for this session stands adjourned.
judges: Bybee, Cardone, Bress